MONIQUE OLIVIER (SBN 190385)
(molivier@sturdevantlaw.com)
WHITNEY HUSTON (SBN 234863)
(whuston@sturdevantlaw.com)
THE STURDEVANT LAW FIRM
A Professional Corporation
354 Pine Street, Fourth Floor
San Francisco, CA  94104
Telephone:  (415) 477-2410
Facsimile:  (415) 477-2420

MARK TALAMANTES (SBN 187961)
(mark@e-licenciados.com)
JENNIFER A. REISCH (SBN 223671)
(jennifer@e-licenciados.com)
TALAMANTES/VILLEGAS/CARRERA, LLP
170 Columbus Avenue, Suite 300
San Francisco, CA 94133
Telephone:  (415) 989-8000
Facsimile:  (415) 989-8028

SHANNON LISS-RIORDAN (*Pro Hac Vice*)
(sliss@llrlaw.com)
HILLARY SCHWAB (*Pro Hac Vice*)
(hschwab@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA  02114
Telephone:  (617) 994-5800
Facsimile:  (617) 994-5801

Attorneys for Plaintiffs and the Putative Plaintiff Class

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEJANDRO JUAREZ, MARIA JUAREZ, LUIS A. ROMERO, and MARIA PORTILLO, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>JANI-KING OF CALIFORNIA, INC., a Texas Corporation; JANI-KING, INC., a Texas Corporation; JANI-KING INTERNATIONAL, INC., a Texas corporation; and DOES 1 through 20, inclusive,<br><br>                Defendants. | Case No.:   CV09-03495 SC<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(b)**<br><br>Date:    September 17, 2010<br>Time:   10:00 am<br>Courtroom:    1, 17th Flr.<br>Judge:  Hon. Samuel Conti<br><br>Complaint filed:   June 22, 2009 |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................2

    A.   Jani-King Is Centralized and Hierarchical.....................................................2

    B.   Franchisees are Subjected to the Standardized Sales
        Pitch And Sales Contract. ..............................................................................3

    C.   Franchisees Are Subject to Uniform and Material
        Omissions and Misrepresentations. ...............................................................4

    D.   JK Deems Franchisees Independent Contractors to Avoid
        Responsibility for Compliance with Labor Laws. .........................................5

    E.   Jani-King Exercises Significant Control Over All Aspects
        of Franchisees Work. .....................................................................................5

III.  LEGAL ARGUMENT..............................................................................................7

    A.   Certification Is Appropriate Under Rule 23....................................................7

        1.   The Legal Standard Under Rule 23. ....................................................7

    B.   All of the Requirements of Rule 23(A) Are Met. ..........................................7

        1.   The Proposed Class Is So Numerous that Joinder of
            All Members Is Impracticable. ............................................................7

        2.   There Are Many Questions of Law and Fact Common to the Class. ...............8

            a)   Plaintiffs' Labor Code Claims Present Common Questions..................8

                (i)   Whether Jani-King Has Misclassified Members of the
                      Proposed Class as Independent Contractors Is a
                      Common Question. .....................................................................9

                (ii)  JK's Liability for the Underlying Labor Code Claims
                      Presents Common Questions of Law and Fact. .......................12

            b)   JK Breaches the Implied Covenant of Good Faith and Fair
               Dealing with All Class Members.........................................................14

            c)   JK Makes Standardized Misrepresentations and Omissions to
               Class Members to Induce Them to Purchase Franchises and to
               Continue Working for JK....................................................................15

i

d)     Jani-King Engages in a Common Course of Conduct that Results in Unlawful, Fraudulent and Unfair Conduct Toward All Class Members under California's Unfair Competition Law ...................................................................18

(i)     The Unlawful and Fraudulent Prongs of the UCL. .................18

(ii)     The Unfair Prong of the UCL. .................................18

3.     The Claims of the Proposed Class Representatives Are Typical of Those of the Class. ..............................................20

4.     The Proposed Representatives and Their Counsel Will Fairly and Adequately Protect the Interests of the Class. .................................21

C.     Certification Is Proper Under Rule 23(B)(2) or Rule 23(B)(3). ...................21

1.     Certification of Plaintiffs' Employment Claims Under Rule 23(b)(2) Is Appropriate to Vindicate Plaintiffs' Rights to Seek Declaratory and Injunctive Relief. ..............................................21

2.     Certification Under Rule 23(b)(3) Is Appropriate Because Common Issues Predominate and Because a Class Action Is the Superior Method for Resolving the Disputes. ..............................................23

a)     Common Questions Predominate. .......................................23

b)     A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of this Controversy. ...........................24

IV.     CONCLUSION. ..............................................26

ii

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997)...................................................................23

*Ansoumana v. Gristede's Operating Corp.*,
    201 F.R.D. 81 (S.D.N.Y. 2001) ....................................................9

*Baby Neal v. Casey*,
    43 F.3d 48 (3d Cir. 1994) .............................................................22

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ....................................................7, 24

*Castillo v. N & R Services of Central Fla., Inc.*,
    2008 WL 1959691 (M.D. Fla. May 1, 2008)................................14

*Chavez v. Blue Sky, F.R.D.* ,
    2010 WL 2528525 (N.D. Cal. Jun. 18, 2010)...................15, 21, 24

*Chun-Hoon v. McKee Foods Corp.*,
    2006 WL 3093764 (N.D. Cal. Oct. 6, 2006)................................12

*Chun-Kee Walker v. Bankers Life & Casualty Co.*,
    2007 WL 2903180 (N.D. Ill. Oct. 1, 2007)....................................9

*Cruz v. Dollar Tree Stores, Inc.*,
    2009 WL 1458032 (N.D. Cal. May 26, 2009)..............................12

*De Giovanni v. Jani-King International, Inc.*,
    262 F.R.D. 71 (2009) ...................................................................20

*Dilts v. Penske Logistics, LLC, F.R.D.* ,
    2010 WL 1709807 (S.D. Cal. Apr. 26, 2010)..............................12

*Dukes v. Wal-Mart, Inc.*,
    509 F.3d 1168 (9th Cir. 2007) ...............................................20, 21

*Dukes v. Wal-Mart Stores, Inc.*,
    603 F.3d 571 (9th Cir. 2010) ...............................................7, 8, 22

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)........................................................................7

*General Telegraph Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)........................................................................7

*Greenwood v. Compucredit Corp.*,
    2010 WL 291842 (N.D. Cal. Jan 19, 2010)................................24

*Grochowski v. Phoenix Construction*,
    318 F.3d 80 (2d Cir. 2003)...........................................................25

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ............................................................................8, 20, 25

*Jordan v. Los Angeles County*,
    669 F.2d 1311 (9th Cir. 1982),
    *vacated on other grounds*, 459 U.S. 810 (1982).............................................................7

*Local Joint Exec. Board of Culinary/Bartender Trust Fund*
    *v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir. 2001) ...................................................................................23

*Lozano v. AT&T Wireless Services, Inc.*,
    504 F.3d 718 (9th Cir. 2007) .................................................................................18, 19

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) .....................................................................................23

*Narayan v. EGL, Inc.*,
    2010 WL 2735708 (9th Cir. 2010) ..........................................................................9, 10

*Plascencia v. Lending 1st Mortgage*,
    259 F.R.D. 437 (N.D. Cal. 2009).................................................................................17

*Probe v. State Teachers Retir. System*,
    780 F.3d 776 (9th Cir. 1986) ....................................................................................22

*Rosiles-Perez v. Superior Forestry Serv., Inc.*,
    250 F.R.D. 332 (M.D. Tenn. 2008) ..........................................................................14

*Scott v. Snelling & Snelling, Inc.*,
    732 F. Supp. 1034 (N.D. Cal. 1990) ..........................................................................19

*Smith v. Cardinal Logistics Management Corp.*,
    2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ...............................................................9

*Stanton v. Boeing*,
    327 F.3d 938 (9th Cir. 2003) ......................................................................................8

*Ste. Marie v. Eastern Railroad Association*,
    72 F.R.D. 443 (S.D.N.Y. 1976) .................................................................................25

*In re Urethane Antitrust Litigation*,
    237 F.R.D. 440 (D.Kan. 2006)...................................................................................25

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) .....................................................................................15

*Vathana v. EverBank*,
    2010 WL 934219 (N.D. Cal. Mar. 15, 2010)................................................................24

*Wahl v. America Sec. Insurance Co.*,
    2010 WL 1881126 (N.D. Cal. May 10, 2010) ..............................................................19

*Williams v. Gerber Products Co.*,

iii

552 F.3d 934 (9th Cir. 2008) .................................................................................17

*Yokoyama v. Midland National Life Insurance Co.*,
594 F.3d 1087 (9th Cir. 2010) ...............................................................17, 24, 25

## STATE CASES

*Cel-Tech Communications Inc. v. L.A. Cellular Telegraph Co.*,
20 Cal. 4th 163 (1999) ...........................................................................................18

*Day v. AT&T*,
63 Cal. App. 4th 325 (1998) ..................................................................................15

*Discover Bank v. Superior Court*,
36 Cal. 4th 148 (2005) ...........................................................................................25

*Edwards v. Arthur Anderson, LLP*,
44 Cal. 4th 937 (2008) ...........................................................................................19

*Estrada v. FederalEx Ground Package System, Inc.*,
154 Cal. App. 4th 1 (2007) ....................................................................................12

*Guz v. Bechtel National, Inc.*,
24 Cal. 4th 317 (2000) ...........................................................................................14

*Hunter v. Up-Right, Inc.*,
6 Cal. 4th 1174 (1993) ...........................................................................................18

*McKell v. Wash. Mutual, Inc.*,
142 Cal. App. 4th 1457 (2006) ..............................................................................18

*Morillion v. Royal Packing Co.*,
22 Cal. 4th 575 (2000) ...........................................................................................13

*Prince v. CLS Transport, Inc.*,
118 Cal. App. 4th 1320 (2004) ..............................................................................12

*S.G. Borello & Sons, Inc. v. Department of Industrial Relat's*,
48 Cal. 3d 341 (1989) ...............................................................................................9

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) .....................................................................................17, 24

*Waller v. Truck Insurance Exch., Inc.*,
11 Cal. 4th 1 (1995) ...............................................................................................14

*Weinstat v. Dentsply International, Inc.*,
180 Cal. App. 4th 1213 (2010) ..............................................................................15

## FEDERAL STATUTES

Federal Rules of Civil Procedure
    23.................................................................................... passim
    23(a) ...............................................................................1, 7
    23(b) .......................................................1, 7, 8, 20, 21, 22
    23(b)(2) .........................................................................1, 7
    23(b)(3) .................................................1, 2, 7, 23, 25

## STATE STATUTES

California Business & Professions Code
    § 16600.........................................................................19
    § 17200.........................................................................18

California Labor Code
    § 221.............................................................................13
    § 226.............................................................................13
    § 1174...........................................................................13
    § 1182.11-1182.13 .......................................................13
    § 1197...........................................................................13
    § 2802...........................................................................13
    § 2802 (a) .....................................................................13
    § 3357.............................................................................9

California Code of Regulations, Title 8
    § 11000...........................................................................8
    § 11050......................................................................8, 13

Civil Code
    § 1607.5.......................................................................19
    § 1632.........................................................................19

## OTHER AUTHORITIES

1 Witkin, *Summary of California Law, Contracts*
    § 798...........................................................................14
    § 801...........................................................................15

Conte & Newberg, *Newberg on Class Actions,*
    § 3.5 .............................................................................8
    § 3:10 ...........................................................................8
    § 9.59.........................................................................25

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(B); CASE NO. CV 09-03495 SC

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on September 17, 2010, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom B of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, before the Honorable Samuel J. Conti, Plaintiffs Alejandro Juarez, Maria Juarez, Luis A. Romero, and Maria Portillo, on behalf of themselves and those similarly situated ("Plaintiffs"), will respectfully move this Court for certification of the proposed class defined below under Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs make this motion on the grounds that their claims meet the requirements of Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) as set forth in the accompanying brief.  This Motion will be based on this Notice; the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Class Certification, and the supporting evidence filed herewith; the Court's file in this action; and other argument or evidence presented at the hearing on the Motion.

DATED:  July 16, 2010

Respectfully submitted,

THE STURDEVANT LAW FIRM
A Professional Corporation

TALAMANTES/VILLEGAS/CARRERA, LLP

LICHTEN & LISS-RIORDAN, P.C.


By: /s/ Monique Olivier
     Monique Olivier
     Attorneys for Plaintiffs

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Plaintiffs challenge the systemic and egregious legal violations committed by the largest commercial janitorial franchise company in the world.  Defendant Jani-King of California ("Jani-King" or "JK") purports to sell cleaning "franchises" to individuals for large sums of money in exchange for "offering" them the opportunity to service cleaning accounts.  JK knows it does not have sufficient business to meet its obligation to "offer" all these accounts, and knows that the accounts are bid in a manner that does not allow members of the proposed class to make a profit.  Nevertheless, JK sells the "franchises" in order to continually reap the profits of putative class members' cheap labor and substantial payments towards the purported "franchises."  Putative class members think they are buying the American dream – to own their own business.  In reality, under JK's system, they are effectively paying JK for low-wage jobs, not real "business opportunities."  To carry out this system, JK classifies the entire putative class of "franchisees" who perform cleaning work on its California accounts as independent contractors, thereby systematically denying them the protections to which employees are entitled under California wage laws as well as other benefits that inure from the employment relationship.

In order to challenge the legality and fairness of this system, pursuant to Fed. R. Civ. P. 23, Plaintiffs seek to certify a class of "all persons who have performed janitorial work on cleaning accounts as Jani-King "franchisees" within the State of California at any time from June 22, 2005 up to and through the time of judgment."

Class certification is appropriate pursuant to Rules 23(a) and 23(b)(2) or 23(b)(3).  All of the prerequisites to a class action in Rule 23(a) – numerosity, common questions, typicality, and adequacy – are satisfied.  In particular, common issues such as whether class members are misclassified as independent contractors and whether JK makes standardized misrepresentations and omissions pervade this case.  Additionally, certification of Plaintiffs' employment claims is appropriate under Rule 23(b)(2).  Plaintiffs seek meaningful declaratory and injunctive relief in order to change JK's policies and procedures so that they function effectively to properly classify class

members as employees, and compensate class members in accordance with California law.  Class

certification of Plaintiffs' misrepresentation, breach of covenant of good faith and fair dealing, and

Unfair Competition Law claims is appropriate pursuant to Rule 23(b)(3) because common questions

of law and fact with respect to JK's standard franchise contract and its uniform franchise operations

predominate over any individual issues of damages.

## II.     STATEMENT OF FACTS

### A.     Jani-King Is Centralized and Hierarchical.

JK provides janitorial services to commercial entities.  Its business model is based on selling

franchises to individuals who clean those entities who have contracted with JK for cleaning services.

Jani-King International, Inc. ("JKI") is the parent corporation that owns the trademark and has

developed the systems used by all JK regional offices.  (Evidence Tab S ("S") ¶ 3.)[1]  JK has four

regional offices each of which is run by and reports directly to JKI.  (S ¶ 5.)

JKI operates a "system," in which all processes, policies and procedures are provided by JKI

and implemented, as instructed, by the regions.  (S ¶ 6.)  "Jani-King International's expectation is for

the regions to implement our system."  (*Id.*)  JK's system includes its polices and procedures for

franchise and account sales, its accounting and data management systems, its franchisee training, and

its operations – in short, everything that JK does is part of its "system."  (S ¶ 7.)

Detailed manuals instruct regional staff exactly how to market and sell both franchises and

cleaning accounts.  (S ¶ 8.)  The manuals also direct how they should run the day-to-day operations

of the business.  (S ¶ 9.)  JK employees are expected to strictly follow these guidelines.  (S ¶ 10.)

Manuals and training classes similarly instruct JK franchisees, in detail, how to clean accounts and

operate their franchise.  (S ¶ 11.)

JKI manages and controls all of the business operations of JK.  Accounting is run by JKI,

including JK's accounts payable.  (S ¶ 12.)  Regional offices report to JKI, on a daily basis,

---

[1] Evidence is being filed concurrently herewith as Evidence Submitted by Plaintiffs in Support of Plaintiffs' Motion for Class Certification.  Where applicable, paragraph, exhibit, page and line numbers, or Bates numbers, will also be provided.

1   regarding franchise financial activity.  (S ¶ 13.)  A weekly memo from JKI charges regional offices

2   with daily tasks and regional offices send weekly and monthly status reports to JKI.  (S ¶ 14.)  When

3   a franchise is sold, the franchise agreement is promptly sent to JKI because regions are not allowed

4   to keep the agreement for more than 48 hours.  (S ¶ 15.)  Opening of new cleaning accounts, account

5   contract changes, and transfer of cleaning accounts between franchisees are all reported to JKI daily

6   because it has exclusive control over the information technology systems that manage this

7   information.  (S ¶ 16.)  Advertising, job descriptions, and any large account bids require corporate

8   approval.  (S ¶ 17.)  Legal matters are also handled by JKI.  (S ¶ 18.)

9         In sum, JKI ensures that the regional offices are uniform down to the last detail.  Not only are

10   the offices designed to operate identically, they must look identical as well.  (S ¶ 19.)

11         **B.      Franchisees Are Subjected to the Standardized Sales Pitch and Sales Contract.**

12         The franchise sales process is strictly controlled by JKI.  All prospective franchise buyers are

13   subjected to the same sales pitch and are provided with identical marketing and franchise disclosure

14   documents.  (S ¶ 20.)  When a prospective franchisee first inquires about a franchise, employees

15   have a script response.  (S ¶ 21.)  At an initial meeting with prospective franchisees, JK mandates the

16   informational materials they are to be provided and the sales pitch they are given.  (S ¶ 22.)  JK uses

17   a similar set of scripts and standardized agreements for contract sales.  (S ¶ 30.)  Employees are

18   trained to follow these precise and specific guidelines.  (S ¶ 23.)  Similarly, once an individual

19   decides to purchase a franchise, they must sign a standard form adhesion contract prepared by JKI.[2]

20   (S ¶ 24.)  The contract is non-negotiable.  (S ¶ 26.)

21         According to JK's standard contact and its requirements, of the amount that franchisees will

22   earn for cleaning accounts, over 20% of this is paid back to JK in fees.  (S ¶ 27.)  JK has sole

23

24   _____
     [2] JK offers several franchise "plans," but the only difference between the plans is the upfront

25   costs, the corresponding amount of business that will be offered to the franchisee, and the time by
     which that business to be offered must be made.  For example, Plan A has an upfront cost of $8,600
     for an initial business of $500 per month and Plan D has an upfront cost of $13,500 for an initial

26   business of $3,000 per month.  (S ¶ 25.)  Each franchisee – regardless of which franchise plan they
     have purchased – is subject to the same sales pitch, the same contract, and same control over their

27   business.  (*Id.*)

28

discretion to add numerous other fees, including complaint fees, services fees, transfer fees, administration fees, and chargebacks.  (S ¶ 28.)  Additionally, if a franchisee services an account after JK has met its Initial Business Obligation ("IBO")[3], the franchisee pays costly finder's fees, which further reduces the portion of the cleaning account contract price franchisees actually receive.  (S ¶ 29.)  Franchisees pay significant amounts to JK each month, commonly as much as 50% and even up to 76% of their gross revenue, *before* accounting for necessary expenses.  (S ¶ 31.)  In fact, franchisees have the experience of working in a given month, but actually *owing* JK money for having cleaned its accounts.  (S ¶ 32.)

JK negotiates franchise contracts in languages other than English, but none of the disclosures, franchise contract, or manuals are provided to potential franchisees in the language in which they are negotiated.  (S ¶ 33.)

### C.    Franchisees Are Subject to Uniform and Material Omissions and Misrepresentations.

During its standardized sales process, JK promises franchisees that they will own their businesses and be their own bosses and then makes numerous critical factual omissions that, if disclosed, would paint a very different picture of life as a JK franchisee.  (S ¶ 34.)  Each of these omissions is the same across the board because JK uses a centralized and uniform system of disclosing information to franchisees that leaves no room for variation.  For example, JK fails to disclose that it does not have sufficient cleaning business available to satisfy its IBO to franchisees.  (S ¶ 35.)  JK conceals the fact that the price it negotiates for cleaning accounts, after all fees are deducted, leaves franchisees without a profit and with little to no return on their investment.  (S ¶ 37.)  JK disclosures omit key information that would enable a franchisee to understand the profitability of the franchise, such as the average amount of time accounts stay with JK, the monthly account loss rate, and the average amount of time a franchise services an account, which would reveal that franchisees are unlikely to hold accounts long enough to recap their investment.  (S ¶ 42.)

---

[3] JK's Initial Business Obligation is its requirement under the franchise agreement, to offer franchisees the right to service commercial cleaning accounts equal to a predetermined gross monthly billing amount.  .

1   JK also conceals the fact that it has an exceedingly lax standard for when it considers its obligation

2   to make an offer for the IBO satisfied.  Effectively its "offer" obligations are illusory.  (S ¶ 43.)

3   Because making an offer fulfills JK's legal obligation without regard for whether the franchisee can

4   realistically accept the offer, it actually promises nothing to the franchisee.  (*Id*.)  Offers are provided

5   without a guarantee of an opportunity to respond and without allowing franchisees to inspect the

6   account to be cleaned before accepting or declining the account.  (S ¶ 44.)

7        JK not only conceals these facts prior to the sale of a franchise, but also perpetuates these

8   omissions throughout its relationship with the franchisees.  (S ¶ 45.)  As a result of JK's ongoing

9   concealment, franchisees continue the cycle of investing their money and labor into a franchise

10  which cannot make a profit.  (*Id*.)

### D. JK Deems Franchisees Independent Contractors to Avoid Responsibility for Compliance with Labor Laws.

12        JK treats franchisees who perform janitorial work on its cleaning accounts as independent

13  contractors.  (S ¶ 46.)  JK admittedly does not comply with labor law requirements for franchisees

14  who perform janitorial work, including the requirement to pay minimum wage, reimburse employees

15  for necessary expenses, or provide itemized wage statements.  (S ¶ 47.)  JK bids its contracts without

16  regard for whether workers cleaning the account will receive minimum wage for the hours worked

17  and JK has no means to ensure that a contract bid price is sufficient to pay minimum wage.  (S ¶ 48.)

18        By its own admission, however, JK is the employer of franchisees.  JK provides *employment*

19  verification for franchisees that explains, "[franchisee] is employed in position of Franchise Owner

20  for Jani-King of California, Inc.…  His position is a permanent position with a 40-hour work week.

21  His current salary is … per month."  (S ¶ 49.)  JK refers to its franchisees as "personnel" and

22  "employees."  (S ¶ 50.)  JK's system of selling itself to cleaning accounts relies on its assurances that

23  it controls and supervises franchisees' work, as it would with employees.  (S ¶ 51.)

### E. Jani-King Exercises Significant Control Over All Aspects of Franchisees Work.

25        Prior to purchasing a JK franchise, JK franchisees must fill out an "application" that is

26  remarkably similar to a job application.  (S ¶ 52.)  Before JK will provide franchisees with any

27  accounts to clean, they must attend a mandatory, unpaid, training on JK's cleaning techniques and

28

5

rules for interacting with customers.  (S ¶ 53.)  JK franchisees must clean using JK cleaning techniques and using the material and equipment required by JK.  (S ¶ 54.)  If JK determines that franchisees are not performing well, JK may require them to attend additional training.  (S ¶ 55.)

Franchisees' work hours and conditions are tightly controlled by JK.  Franchisees must be reachable by JK within 4 hours of contact and franchisees must notify JK before going on vacation (S ¶ 56.)  JK requires franchisees to wear uniforms with the JK logo and they are required to be on-site at cleaning accounts.  (S ¶ 57.)  Franchisee work is heavily supervised; routine inspections and supervision of franchisees cleaning is part of the JK "system."  (S ¶ 58.)

JK also has detailed requirements regarding how franchisees interact with clients and clean accounts.  JK instructs franchises to communicate with clients directly at least once a month, using a JK form that must be submitted to the regional office.  (S ¶ 59.)  Franchisees are required to use four different forms for communicating with clients, all of which must be submitted to JK when filled out by the client.  (S ¶ 60.)

JK has the exclusive power to assign franchisees to clean accounts and remove franchisees from accounts.  The contract for cleaning services is between JK and the business.  (S ¶ 61.)  The franchisee is not a party and has no rights to the contract.  (*Id.*)  JK can, and does, assign and take cleaning accounts away from franchisees at its discretion, with or without notice, or an opportunity to cure the alleged problem.  (S ¶ 62.)  In other words, franchisees perform work for JK at-will.

Although franchisees are permitted to acquire cleaning accounts themselves, they must use JK's required marketing tools, obtain regional office approval prior to bidding on the account, and use JK's standardized contract.  (S ¶ 63.)  Even if the franchisee is successful in obtaining a new client, the contract for services belongs to JK.  (S ¶ 64.)  JK can transfer the account acquired by the franchisee away from the franchise, at JK's discretion.  (S ¶ 65.)  Additionally, franchisees must obtain approval before they can modify a contract or negotiate new prices for any of the services they provide to clients.  (S ¶ 66.)

Franchisees are not allowed to handle a customer complaint or potential cancellation on their own; instead, they must notify the regional office immediately and follow JK's instructions for

1   addressing the customer's concerns.  (S ¶ 67.)  JK can effectively force franchisees to continue

2   working on accounts.  Even if franchisees cannot or do not want to continue working on account

3   (because, for example, they are losing money on the account), JK may require them to continue

4   working on an account.  (S ¶ 68.)

5        JK strictly controls all efforts by franchisees to market or expand his or her business.  If a

6   franchisee wants to establish an office location, establish a trade or business name, or create a

7   vehicle display, approval is required.  (S ¶ 69.)  Additionally, franchisees must always use JK's

8   name and contact phone number.  (S ¶ 70.)

9   **III.   LEGAL ARGUMENT**

10       **A.    Certification Is Appropriate Under Rule 23.**

11            1.    <u>The Legal Standard Under Rule 23</u>.

12       In deciding a motion for class certification, the Court focuses on whether the requirements of

13   Rule 23 have been satisfied.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).  "The court is

14   bound to take the substantive allegations of the complaint as true" in determining the appropriateness

15   of class certification.  *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975).  To the extent the

16   Court looks beyond the allegations of the complaint, it does so not to resolve any questions of the

17   merits, but to determine issues of class treatment.  *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 587

18   (9th Cir. 2010); *see Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

19       Class certification is proper here because the four requirements of Rule 23(a) are met, and

20   certification of is appropriate under both Rule 23(b)(2) and (b)(3).

21       **B.    All of the Requirements of Rule 23(a) Are Met.**

22            1.    <u>The Proposed Class Is So Numerous that Joinder of All Members Is</u>

23                  <u>Impracticable</u>.

24       Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all class

25   members is impracticable.  *Jordan v. Los Angeles County*, 669 F.2d 1311, 1319 (9th Cir. 1982),

26   *vacated on other grounds*, 459 U.S. 810 (1982) (joinder impracticable where putative class

27   comprised of 39 members).  Here, because there are at least 1,900 individuals who fall within the

28

class definition, the numerosity requirement is easily satisfied.  (S ¶ 77.)  Such a number satisfies

any standard of impracticability.  *See* Conte & Newberg, *Newberg on Class Actions*, § 3.5 p. 247

(4th ed. 2002) (presumption that joinder is impracticable if more than 40 class members).

> 2.  There Are Many Questions of Law and Fact Common to the Class.

Under Rule 23(a)(2), Plaintiffs must show one or more questions of law or fact common to

the class.  The Ninth Circuit has held that "[R]ule 23(a)(2) has been construed permissively.  All

questions of fact and law need not be common to satisfy the rule.  The existence of shared legal

issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled

with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th

Cir. 1998); *see Stanton v. Boeing*, 327 F.3d 938, 953 (9th Cir. 2003).

Importantly, "[a]ll questions of fact and law need not be common to satisfy the rule" because

"[t]he commonality test is qualitative rather than quantitative – one significant issue common to the

class may be sufficient to warrant certification."  *Dukes,* 603 F.3d at 599 (citations & quotation

marks omitted); *Newberg on Class Actions*, *supra*, § 3:10 at pp. 272-77 (the commonality

requirement "is easily met in most cases").

> a)  Plaintiffs' Labor Code Claims Present Common Questions.

JK uniformly classifies its "franchisees" as independent contractors, rather than as its

employees, in order to avoid any responsibility for ensuring that the people who carry out its

cleaning services are treated in accordance with California's labor laws.  (S ¶ 46.)  Plaintiffs' claims

arise from the contention that JK's classification of franchisees as "independent contractors" is a

sham and mere subterfuge to avoid the consequences of their true status as JK employees.

JK admits that it does not treat franchisees who perform janitorial work on its cleaning

accounts in compliance with the California Labor Code and applicable Industrial Welfare

Commission Wage Orders, Cal. Code Regs. tit. 8, § 11000, *et seq*. ("Wage Orders"),[4] and fails to

ensure they receive at least the applicable minimum wage, reimbursement for their necessary

---

[4] Wage Order 5-2001 (Cal. Code Regs. tit. 8, § 11050), governs the janitorial and other "public housekeeping" industries in California.

expenses, or itemized wage statements.  Rather, JK takes the position that because it has decided that class members are non-employee "franchise owners" it need not comply with these laws.

(i)   Whether Jani-King Has Misclassified Members of the Proposed Class as Independent Contractors Is a Common Question.

JK's potential liability on the Labor Code claims rests on a single issue: whether the franchisees who are selected, approved, placed, and paid by JK to fulfill the janitorial service needs of its clients qualify as employees.  The answer to this question will turn on an analysis of JK's common policies and practices towards franchisees and its right and exercise of control over the franchisees, which are consistent throughout the class period and across California.  Courts routinely find commonality with this legal question.  *See, e.g., Smith v. Cardinal Logistics Mgmt. Corp.*, 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008) ("the underlying legal issue is whether the putative class members were improperly classified as independent contractors in violation of California law"); *Chun-Kee Walker v. Bankers Life & Cas. Co.*, 2007 WL 2903180, at *4 (N.D. Ill. Oct. 1, 2007) ("[h]ere, the common overarching legal issue is whether [Defendant] misclassified agents as independent contractors [under California law]"); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85 (S.D.N.Y. 2001) ("[t]he central issue posed by the case is whether the Plaintiffs were employees or independent contractors, and … [therefore, c]ommon questions of law and fact predominate").  Significantly, there is a rebuttable presumption of employment that applies to all persons performing services for another.  *See* Lab. Code § 3357; *Narayan v. EGL, Inc.*, 2010 WL 2735708, at *9, 10078-79 (9th Cir. 2010).  Thus, it is JK's burden to prove that the franchisees, whose services JK has retained, are independent contractors rather than employees.  *See S.G. Borello & Sons, Inc.* 48 Cal. 3d at 349, 354.

Under California law, the determination of whether an independent contractor relationship exists depends primarily upon "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired."  *S.G. Borello & Sons, Inc. v. Dep't. of Indus. Relat's*, 48 Cal. 3d 341, 350 (1989) (quoting *Tieberg v Unempl. Ins. Appeals Bd.,* 2 Cal. 3d 943, 946 (1970)) (internal quotation marks omitted).  However, "[a] business entity may not

9

avoid its statutory obligations by carving up its production process into minute steps, then asserting that it lacks 'control' over the exact means by which one such step is performed by the responsible workers." *Id.* at 357.  Moreover, it is the right of control, not the exercise of the right, which bears on the status of the work arrangement.  *Id.* at 357 n.9; *see also, Narayan v. EGL, Inc.*, ____ F. 3d ____ 2010 WL 2735708, at *5-6 (9th Cir. Jul. 13, 2010) (employers operational control over workers performance, appearance, interactions with customersv and equipment and supplies used demonstrated employment relationship).[5]

In addition to the right to control the work to be done, courts recognize "several 'indicia' of the nature of a service relationship," including whether the putative employer has "the right to discharge at will, without cause."  *Id.* at 350-51.  Other secondary factors include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

---

[5] The question of whether JK has misclassified franchisees who perform cleaning work on its accounts as non-employees may also be informed by the definition of "employ" and "employer" under California law.  The California Supreme Court recently held that, in actions seeking to enforce state minimum wage laws (such as those at issue in this case), these terms are to be defined broadly in accordance with the disjunctive, alternative definitions of "employ" found in the IWC Wage Orders.  *See Martinez v. Combs.*, 49 Cal. 4th 35, 52 (2010).  As the Court stated:

> To employ, then, under the IWC's definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship.

*Id.* at 64.  The "suffer or permit" component is broad enough to cover "irregular working arrangements the proprietor of a business might otherwise disavow with impunity."  *Id.* at 58.  Further, "A proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so."  *Id.* at 69.  The Court also noted that the "control" component of the definition encompasses "any person … who directly or indirectly, or though an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person," and is "broad enough to reach through straw men and other sham arrangements to impose liability for wages on the actual employer [...]."  *Id.* at 71.

1  *Id.*

2      As detailed above, JK entirely controls the franchisees' schedule, tasks, accounts, uniforms,

3  cleaning techniques, and rates of pay.  (S ¶¶ 53-54, 56-57, 61-66.)  JK imposes standardized and

4  detailed procedures for franchisees' method, timing, and frequency of its interactions with cleaning

5  accounts.  (S ¶¶ 59-60.)  Franchisees are instructed to route all customer complaints through JK's

6  office personnel, and not handle them on their own.  (S ¶ 67.)  JK's strict supervision of franchisees'

7  cleaning work performance uses a uniform set of criteria, forms, and procedures.  (S ¶ 58.)

8      JK's uniform policy and practices vest it with the exclusive power to determine which

9  accounts, if any, a franchisee will be offered, transferred, or removed.  (S ¶¶ 61-62, 65.)  JK can

10  force franchisees to continue working on accounts, even if they wish to stop working on them.

11  (S ¶ 68.)  JK also has the power to prevent franchisees from working by removing accounts at its

12  discretion.  (S ¶ 65.)  In effect, JK treats franchises like "at-will" employees who it can and does

13  unilaterally assign and remove take away work.

14      Additionally, JK's standardized bidding and contract documents are determinative of the

15  services that franchisees are asked and required to perform.  (S ¶ 30.)  JK's standardized cleaning

16  contracts do not vary depending on the particular skill or on its particular relationship with the

17  franchisee assigned to do the cleaning work.  This contract – which is created and owned by JK –

18  controls the terms and conditions of franchisees' work, including the wages that they are able to

19  earn.  (S ¶¶ 64-65.)  JK's ownership of all of its service contracts and prohibition on franchisees

20  from entering into, modifying, or negotiating new prices for any of the services they provide without

21  JK's approval demonstrates JK's control over franchisees.  (S ¶ 66.)

22      Finally, the additional factors considered by courts also tend to establish an employment

23  relationship between JK and the class.  For example, JK class members do not engage in a distinct

24  business or occupation; rather they provide the very janitorial services that JK sells to its customers.

25  (S ¶¶ 71-72.)  Also, providing janitorial services does not require any special training or licenses

26  (S ¶ 71), and JK determines and supplies the locations for franchisees to clean.  (S ¶ 61.)

27      In sum, evidence of JK's control over franchisees work, and thus the proof that they are

28

employees, is pervasive and common to the class.

(ii)     JK's Liability for the Underlying Labor Code Claims Presents Common Questions of Law and Fact.

Once this Court has determined that franchisees are employees rather than independent contractors, this Court can determine on a class-wide basis: (1) whether the class was compensated in accordance with California minimum wage law; (2) whether JK failed to reimburse the class for necessary business expenditures; and (3) whether JK has provided itemized wage statements that comply with California law.

Courts frequently certify classes of workers seeking to enforce California wage laws, finding that common questions predominate.  *See, e.g.*, *Cruz v. Dollar Tree Stores, Inc.*, 2009 WL 1458032, at *9 (N.D. Cal. May 26, 2009) (overtime claims); *Dilts v. Penske Logistics, LLC*, ____ F.R.D.____, 2010 WL 1709807, at *11 (S.D. Cal. Apr. 26, 2010) (claims for meal and rest breaks, overtime compensation, business expenses, unlawful deductions, and timely payment of wages); *Chun-Hoon v. McKee Foods Corp.*, 2006 WL 3093764, at *2 (N.D. Cal. Oct. 6, 2006) (predominant common question whether class members were misclassified as independent contractors); *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1 (2007) (claims for failure to reimburse expenses arising from misclassification as independent contractors); *see also Prince v. CLS Transp., Inc.*, 118 Cal. App. 4th 1320, 1328 (2004) ( "wage and hour disputes routinely proceed as class actions").

Each of Plaintiffs' Labor Code claims presents common questions.  First, Plaintiffs can show based on common proof that JK's bidding practices fail to ensure that class members receive minimum wage.  As Plaintiffs' expert explains because a franchisee's only income is derived from the cleaning of accounts, *all* costs of doing business (*e.g.*, the cost of overhead, supplies, and supervision) must be factored into these bids in order to ensure that minimum wage will be earned. (E ¶¶ 11-12.)  Yet, JK readily admits that in making its bids, JK does not factor in all of these costs. (S ¶¶ 39, 48.)  JK also acknowledges that it does not even calculate how much a franchisee will earn after all of the expenses related to cleaning accounts are accounted for.  (S ¶ 40.)

Similarly, Plaintiffs' common proof will also demonstrate that JK's bids include only the actual hours estimated to clean an account and do not take into account any travel or administrative

12

time.  (S ¶ 41.)  It is undisputed that JK does not compensate franchisees for such and also does not

pay them to attend JK's mandatory initial training.  (*Id.*)  If the members of the proposed class are

deemed employees, they must be compensated for all "hours worked."  Labor Code §§ 1182.11-

1182.13, 1197; *see also* Wage Order 5-2001 (Cal. Code Regs. tit. 8, § 11050), subd. 2(K) &

*Morillion v. Royal Packing Co.*, 22 Cal. 4th 575 (2000) (discussing definition of "hours worked").

Second, Plaintiffs' claim under Labor Code § 2802 also presents common questions.  Section

2802 requires that employers "indemnify his or her employee[s] for all necessary expenditures or

losses incurred by the employee[s] in direct consequence of the discharge of [their] duties."  Lab.

Code § 2802(a).  Plaintiffs and members of the proposed class are engaged in a common type of job,

performing substantially similar tasks that require them to regularly incur a common set of expenses

which include: cleaning supplies, materials, and equipment, uniforms, insurance, and gas/mileage.

JK's policy is not to reimburse franchisees for any of these expenses.  (S ¶ 47.)  Thus, whether this

policy violates § 2802 is a question common to the class.

Third, under Labor Code § 221, it is unlawful "for any employer to collect or receive from an

employee any part of wages theretofore paid by said employer to said employee."  It is undisputed

that, pursuant to its standardized franchise agreements, JK routinely deducts numerous fees from

class members' monthly pay.  (*Id.*)  All of these fees are assessed pursuant to standard formulas, *e.g.*

JK deducts a certain percentage of each class member's gross monthly income.  (S ¶¶ 27-28.)  Thus,

there is a common legal question as to whether any or all of these deductions constitute a forfeiture

of earned wages, and thereby violate this statutory provision.

Finally, employers are required to provide employees with itemized wage statements that

identify, at a minimum, the straight time rate for the employee, the regular rate used to compute the

overtime rate, the overtime rate, and the number of hours worked at each of the rates that apply to

the employee's pay period.  Lab. Code §§ 226, 1174; Wage Order 5-2001, ¶ 7(B).  It is undisputed

that JK fails to issue itemized wage statements to class members.  Instead, it issues standard monthly

billing statements ("Franchise Reports") that do not identify any of the rates being used, nor do they

specify the number of hours worked or which hours are being paid at each rate.  (S Exs. 19-21.)  A

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE
23(B); CASE NO. CV 09-03495 SC

common question exists as to whether JK has unlawfully failed to provide itemized wage statements. Since the sufficiency of wage statements is determined directly from the information on the employer's form, courts have held that wage statement claims raise common questions of law and fact, and that they are well-suited for class treatment. *See, e.g.*, *Castillo v. N & R Servs. of Cent. Fla., Inc.*, 2008 WL 1959691, at *3 (M.D. Fla. May 1, 2008); *Rosiles-Perez v. Superior Forestry Serv., Inc.*, 250 F.R.D. 332, 340 (M.D. Tenn. 2008).

> b) <u>JK Breaches the Implied Covenant of Good Faith and Fair Dealing with All Class Members.</u>

Plaintiffs seek to certify their claim that JK systematically breaches the implied covenant of good faith and fair dealing with all class members. Because JK's conduct is substantially the same with respect to all class members (who have all signed a standardized franchise agreement), this claim is well-suited for certification.

California recognizes that every contract contains an implied covenant of good faith and fair dealing, "'impos[ing] upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.'" 1 Witkin, *Summary of California Law, Contracts* § 798, p. 892 (10th ed. 2005). This covenant exists "to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349-50 (2000) (emphasis in original); *Waller v. Truck Ins. Exch., Inc.,* 11 Cal. 4th 1, 36 (1995).

Under the terms of the franchise agreement, JK must offer a certain volume (in dollars) of cleaning business to franchisees to service. It does this through *offering* franchisees specific cleaning accounts. (S Exs. 19-21.) Although JK may meet the letter of this contract term, it violates the spirit of its agreement to franchisees in two ways. First, JK construes its "offer" obligation in such a way as to confer no benefit on class members. Specifically, JK's practice is to give itself credit for "offers" to franchisees (1) whether or not the franchisee accepts; (2) without waiting for a response from franchisees before withdrawing the offer; (3) without permitting the franchisee to review the account contract or inspect the account property; and (4) subsequently taking away

14

accounts from franchisees at will.  (S ¶¶ 43-44.)  This practice is evidenced through common proof, in particular, JK''s uniform "system" and its standardized contract terms.  (*Id*.; S Exs. 19-20.)  Moreover, Plaintiffs can and will demonstrate that JK does not have sufficient accounts to make good faith offers (*i.e.*, offers that could be accepted) to all franchisees to fulfill its IBO.  (S ¶ 36 & 73.)  This fact, which is common to the class, further demonstrates that JK does not, and indeed cannot, make its "offers" in good faith.  "The essence of the good faith covenant is objectively reasonable conduct."  Witkin, *supra*, § 801, p. 895.

The second way in which JK breaches the covenant is in its pricing of accounts.  The intent of the franchise agreement term to offer a certain volume of cleaning business is for franchisees to earn a profit.  JK chronically bids its accounts in such a way that, after all the JK fees and the costs of doing business are deducted, franchisees will earn little to no return on their investment in the franchise.  (S ¶ 37)  Again, these facts will be borne by common proof.  (S ¶ 38.)  The fees deducted from franchisee's pay are derived by the same formula for all class members.  (S ¶ 27.)  For example, at least 22.75% of every franchisee's earnings for cleaning accounts is paid to JK (not including finders fees).  (E ¶ 10; S ¶ 39.)  Plaintiffs' expert Steve Cumbow has performed a preliminary analysis of JK's franchise plans, concluding that franchisees will earn little to no return on the money they invest in a franchise.  ([Cumbow] ¶¶ 29-34.)

Plaintiffs will thus be able to demonstrate by common proof that JK has acted unreasonably to deprive class members of the benefit of their agreement in violation of the covenant of good faith and fair dealing.  *See, e.g., Vathana v. EverBank,* 2010 WL 934219, at*4 (N.D. Cal. Mar. 15, 2010) (finding that legal theory for recovery for breach of contract presented common issues that predominated over individual questions).

c)   <u>JK Makes Standardized Misrepresentations and Omissions to Class Members to Induce Them to Purchase Franchises and to Continue Working for JK.</u>

Plaintiffs allege that JK has misrepresented and omitted material facts to Plaintiffs and class

15

members in an effort to induce them to purchase franchises and to continue working for JK.[6]  These

misrepresentations and omissions are subject to common proof because JK has engaged in a

common course of conduct toward all class members.  (Q ¶ 35.)  Specifically, JK has made the

following standardized misrepresentations and fraudulent omissions to all class members:

- JK misrepresents that class members will own their own businesses and be their own bosses.  (Q ¶ 34.)

- JK conceals facts that demonstrate the true cost of a franchise and the near impossibility of making a profit, or even a living wage, by operating a franchise.  In particular, JK:

  ♦ conceals the fact that the price it negotiates for cleaning accounts, after all fees are deducted, leaves franchisee with little to no return on his/her investment.  (Q ¶ 37.)

  ♦ conceals fact that it does not have sufficient business to satisfy the terms of all franchise contracts (*i.e.,* can only meet the IBO if accounts are transferred and redistributed among franchisees).  (Q ¶¶ 35-36.)

  ♦ conceals fact that it deems its "offer" obligations fulfilled even when an offer is made with little or no notice to the franchisee, without giving the franchisee an opportunity to respond, without giving a franchisee an opportunity to inspect the account contract or the account property.  (Q ¶¶ 43-44.)

  ♦ omits information about how it prices accounts, the average amount of time accounts stay with JK, the monthly account loss rate, the average number of franchisees that service an account, and the average amount of time a franchisee is assigned to an account. (Q ¶ 42 & 73.)

The misrepresentations and omissions arise in the context of standardized disclosures to class

members about the details of owning a franchise and thus are made to all class members.  (Q ¶ 35.)

JK follows a standard, detailed protocol when it sells a franchise.  (Q ¶¶ 20, 23.)  It provides the

same documents, makes the same sales presentation, and uses a form franchise agreement.  (Q ¶¶ 20-

24.)  All of the misrepresentations and omissions flow from this common course of conduct and

constitute fraud, concealment, violation of the California Franchise Law and violation of the UCL.

---

[6] These misrepresentations and omissions form the basis of Plaintiffs' First, Second, Third, Fourth, Fifth and (in part) Fourteenth Cause of Action.  Plaintiffs do not seek certification of their Second Cause of Action.

1    The key common question on the UCL fraudulent prong claim is whether JK's

2    representations and omissions are likely to deceive reasonable consumers, which is an objective

3    standard and does not raise individual questions.  *In re Tobacco II Cases*, 46 Cal. 4th 298, 306, 313

4    (2009); *Williams v. Gerber Prods. Co*., 552 F.3d 934, 938 (9th Cir. 2008); *Chavez v. Blue Sky*,

5    F.R.D. ____, 2010 WL 2528525, at *10 (N.D. cal. Jun. 18, 2010).  The UCL prohibits "not only

6    advertising which is false, but also advertising which [,] although true, is either actually misleading

7    or which has a capacity, likelihood or tendency to deceive or confuse the public.'"  *Williams*, 552

8    F.3d at 939 (citation omitted).

9    Plaintiffs will show that JK's statements and omissions are likely to deceive a reasonable

10    consumer.  For example, JK's failure to disclose its bidding accounts relative to the amounts it

11    deducts from franchisees earnings are likely to mislead reasonable individuals into believing that

12    their franchises will be viable, profitable businesses, when in fact they end up generating little to no

13    income.  (S ¶¶ 37-41.)  This can be shown by common proof, including an analysis of the statements

14    and omissions by leading experts in the commercial cleaning industry.  (*See, e.g.*, O ¶¶ 23-61;

15    N ¶¶ 11-12.)  *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1093 (9th Cir. 2010)

16    (reversing denial of class certification, "[t]he jury will not have to determine whether each plaintiff

17    subjectively relied on the omissions, but will instead have to determine only whether those

18    omissions were likely to deceive a reasonable person"); *Day v. AT&T*, 63 Cal. App. 4th 325, 332-34

19    (1998) (defendant liable under the UCL for failing to disclose information to all class members).

20    For both the fraud and the UCL claims, reliance by members of the class may be presumed

21    when the alleged misrepresentations or omissions were material.  *In re Tobacco II Cases*, 46 Cal. 4th

22    at 327; *Chavez*, 2010 WL 2528525, at *11.  "The question of materiality in turn, is whether a

23    reasonable person would attach importance to the representation or nondisclosure in deciding how to

24    proceed in the particular transaction…."  *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th. 1213,

25    1223 n.8 (2010); *Plascencia v. Lending 1ˢᵗ Mortgage*, 259 F.R.D. 437 (N.D. Cal. 2009).  Thus, the

26    question of materiality – how a "reasonable person" would perceive JK's misrepresentations and

27    omissions – creates another issue that is common for all class members.

28

Finally, on the fraud claim, whether JK had a duty to disclose the material facts at issue and intentionally or recklessly failed to do so is a common question of fact and law as the focus is on JK's conduct as to the entire class. *Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174, 1184 (1993).

          d)    <u>Jani-King Engages in a Common Course of Conduct that Results in Unlawful, Fraudulent and Unfair Conduct Toward All Class Members under California's Unfair Competition Law.</u>

The UCL prohibits businesses from engaging in "any unlawful, unfair or fraudulent business act or practice." Bus. & Prof. Code § 17200. Practices violate the UCL if they are unlawful, unfair *or* fraudulent. *Cel-Tech Commc'ns Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999). Plaintiffs have alleged violations of the unlawful, fraudulent and unfair prongs of the UCL as independent bases for class-wide relief. Each of these claims should be certified.

          (i)    <u>The Unlawful and Fraudulent Prongs of the UCL.</u>

JK's misclassification scheme, its violations of the various sections of the Labor Code, its violations of the Corporations Code, its breach of the covenant of good faith and fair dealing, and its commission of fraud all stand as predicate claims for the UCL's unlawful prong. There is no substantive difference in the analysis of these claims under the UCL unlawful prong. Because those claims are appropriate for class treatment as articulated above, Plaintiffs' UCL claims under the unlawful prong are also suitable for class treatment (thus extending any claims for restitution to four years as the statute of limitations under the UCL). Similarly, the fraudulent prong of the UCL, as discussed *supra*, is appropriate for class certification.

          (ii)    <u>The Unfair Prong of the UCL.</u>

Plaintiffs allege that JK engages in several courses of conduct that violate the unfair prong of the UCL. The legal test for the UCL's unfair prong is unsettled in California. *Lozano v. AT&T Wireless Servs., Inc.,* 504 F.3d 718, 736 (9th Cir. 2007). The Ninth Circuit has stated that in consumer cases the test may require that a UCL claim be tied to a legislatively declared policy, *id.*; or be based on an alleged act that "violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *McKell v. Wash. Mut., Inc*., 142 Cal. App. 4th 1457, 1473 (2006) (citations omitted); *see also Lozano,* 504 F.3d

18

at 736.  The Court held that, "in the absence of further clarification by the California Supreme Court," district courts may apply either or both tests to determine in a defendant's conduct is "unfair." *Lozano,* 504 F.3d at 736.

This claim is suitable for certification regardless of which test this Court uses to determine the unfairness of JK's practices because the primary focus of both is on the conduct of JK.[7]  If the unfair practices are sufficiently uniform, as is the case here, a determination can be made on a class-wide basis.  *See, e.g., Wahl v. Am. Sec. Ins. Co.,* 2010 WL 1881126, at *10 (N.D. Cal. May 10, 2010) (certifying UCL unfairness claim involving defendant's common course of conduct).

Common issues under the UCL's unfair prong abound.  First, Plaintiffs allege that JK's fees are excessive and unfair in violation of the UCL.  These fees, automatically deducted from franchisees' pay, are standardized based on its franchise agreement.  (S ¶ 27.)  Whether imposition of these fees violates the UCL will be the same for each franchisee.  The fees charged to franchisees amount to, at a minimum, 22.75%, of a franchisee's monthly billing (*not* including finders fees, complaint fees or any of the numerous other fees JK may elect to charge).  (E ¶ 10.)

Second, JK's policy of negotiating franchise contracts in languages other than English but not providing interpretation of the written contracts is an unfair practice under the UCL.  (S ¶ 33.)  Civil Code § 1632 requires written translation of certain contracts.  Thus Plaintiffs' claim is tethered to a "legislatively declared policy" and applies to the class as a whole.

Third, JK's policy of binding all class members to an oppressive and unlawful non-compete clause in the franchise agreement is an unfair practice that violates the UCL.  (S ¶ 75.)  Such clauses are, with narrow exceptions not applicable here, unlawful in California.  Bus. & Prof. Code § 16600.  JK's non-compete clause purports to prevent franchisees from having a financial interest in a similar company or participate in a competitive company within any jurisdiction in which JK operates, regardless of whether the franchisee is receiving any income from JK.  *See Scott v. Snelling & Snelling, Inc.*, 732 F. Supp. 1034, 1039 (N.D. Cal. 1990); *Edwards v. Arthur Anderson, LLP*, 44 Cal.

---

[7] The "legislatively declared policy" at issue at a minimum includes Civil Code § 1670.5 which prohibits unconscionable contract terms.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(B); CASE NO. CV 09-03495 SC

4th 937, 946-47 (2008).  This claim is thus subject to common proof.

Fourth, the refund policy in JK's standard contract violates the unfair prong of the UCL because JK stands to profit by *failing* to satisfy its contractual obligation to franchisees to provide initial business.  (S ¶ 75.)  The refund policy provides that where JK is unable to satisfy its IBO, it shall refund the franchisee three times the amount of business not offered to the franchisee within the initial offering period (*e.g.*, if a franchisee was supposed to be offered accounts which would generate income of $2,000 per month, but they were only offered accounts that generated $1,000 per month, they would be entitled to a refund of three times $1,000).  (S ¶ 75.)  Because the franchise fee exceeds three times the amount of the IBO under the majority of franchise plans, JK exercise of this option allows it to profit while not fulfilling its agreement.  A common question exists as to whether this refund policy, applicable to all class members, violates the UCL.  *De Giovanni v. Jani-King Int'l., Inc.*, 262 F.R.D. 71 (2009).

3.    <u>The Claims of the Proposed Class Representatives Are Typical of Those of the Class</u>.

Rule 23(a)(3) requires that the claims of the representative parties must be "typical" of the claims of the class.  "The typicality prerequisite of Rule 23(a) is fulfilled if 'the claims or defenses of representative parties are typical of the claims or defenses of the class.  Under the rule's permissive standards, representative claims are 'typical' if they are "reasonably coextensive" with those of absent class members; they need not be substantially identical."  *Hanlon*, 150 F.3d at 1020; *see also Dukes*, 509 F.3d at 1184.

Plaintiffs' claims are typical of the claims of the class because they all arise out of JK's standardized policies and procedures.  (S ¶ 76.)  JK's admitted practice is to treat all franchisees (including Plaintiffs) as independent contractors.  (S ¶ 46.)  Whether Plaintiffs' are employees and whether JK has paid them for all hours worked, reimbursed them for expenses, and failed to provide wage statements will be answered in the same manner as the class.  Also, Plaintiffs have suffered similar injuries as the class because they have not been compensated for all hours worked at the correct rates of pay, and have had unlawful deductions taken from their pay.  (S ¶ 76.)  Similarly, Plaintiffs' misrepresentation, breach, and unfair business practices claims are typical because

Plaintiffs and all class members have been subjected to uniform misrepresentations and omissions in the sale and operation of franchises and bound to the unfair and oppressive terms of the same franchise agreement.  (S ¶ 76.)  Plaintiffs and the class are thus in a materially identical position vis-à-vis JK with respect to these practices.  *See Chavez,* 2010 WL 2528525, at *12 (minor variations of false statements made to Plaintiffs and class did not destroy typicality; same facts and legal theory made claims typical.)  Plaintiffs' claims arise from the same facts and legal theories as the class and are, therefore, typical.

    4.    <u>The Proposed Representatives and Their Counsel Will Fairly and Adequately Protect the Interests of the Class</u>.

Rule 23(a)(4) requires that the proposed class representatives and their counsel must be adequate.  Adequacy has two elements: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel.  *See*, *e.g.*, *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1185 (9th Cir. 2007) (citing *Hanlon*, 150 F.3d at 1020).

Both elements of the adequacy requirement are satisfied here.  Plaintiffs have retained counsel with extensive expertise and experience in prosecuting complex cases and the resources to represent the class effectively.  (P ¶¶ 3-8; Q ¶¶ 3-9; R ¶¶ 3-12.)  Proposed Class Counsel are qualified and able to conduct the proposed litigation.  (*Id.*)  In addition, both the class and the named Plaintiffs share an interest in JK operating in compliance with California law.  Plaintiffs' interests are thus aligned with the class.  (S ¶ 77.)  Plaintiffs have pursued these shared interests by actively participating in the litigation.  (*Id.*)  Further, they do not have any conflict of interest with the Class.  Plaintiffs and proposed Class Counsel will therefore adequately represent the Class.

**C.    Certification Is Proper Under Rule 23(b)(2) or Rule 23(b)(3).**

    1.    <u>Certification of Plaintiffs' Employment Claims Under Rule 23(b)(2) Is Appropriate to Vindicate Plaintiffs' Rights to Seek Declaratory and Injunctive Relief</u>.

Plaintiffs' employment claims may be certified under Rule 23(b)(2)[8], because JK has "acted

---

[8] This includes Plaintiffs' Ninth, Tenth, Eleventh, and Twelfth causes of action in the FAC. (continued on next page)

21

or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "[T]his requirement is almost automatically satisfied in actions primarily seeking injunctive relief," particularly where, as here, the relief sought by the representative plaintiffs will benefit the entire class.  *Baby Neal v. Casey*, 43 F.3d 48, 58-59 (3d Cir. 1994).  As the Ninth Circuit recently affirmed, courts should consider "the objective 'effect of the relief sought' on the litigation" to be satisfied that monetary relief does not predominate over injunctive or declaratory relief.  *Dukes,* 603 F.3d at 617 (citation omitted).

Plaintiffs seek declaratory and injunctive relief that would apply to and benefit the class as a whole.  The relief Plaintiffs seek herein includes, *inter alia*, (1) a declaration that JK franchisees are employees entitled to the panoply of protections for workers that California provides; (2) an injunction prohibiting JK from treating franchisees as independent contractors; (3) an injunction requiring JK to pay workers minimum wage; (4) an injunction requiring JK to reimburse workers for business related expenses; (5) effective monitoring mechanisms to ensure that franchisees are paid for all hours worked; and (6) an injunction requiring JK to issue adequate wage statements.

In addition, Plaintiffs seek equitable monetary relief available under Rule 23(b)(2), including an award of lost wages and other monetary relief under state wage law.  *See*, *e.g.*, *Dukes*, 603 F.3d at 619-20 (back-pay under Title VII is equitable monetary relief for class certified under Rule 23(b)(2)); *Probe v. State Teachers Retir. Sys.*, 780 F.3d 776, 780 (9th Cir. 1986).  Analysis of (b)(2) "turns on the primary goal and nature of the litigation – not the theoretical or possible size of the total damages award."  *Dukes*, 603 F.3d at 618.

Here, Plaintiffs seek injunctive relief that would result in important reforms in JK's policies and practices regarding its treatment and compensation of franchisees.  Plaintiffs' primary aim is to ensure that workers are paid for all hours worked, a critical issue for these hard-working hourly

---

(Footnote continued from previous page)
These claims can also be certified under Rule 23(b)(3).  Plaintiffs are not moving for certification of their Eighth or Thirteenth causes of action.

laborers.  Accordingly, Plaintiffs' employment claims should be certified under Rule 23(b)(2).

2.     Certification Under Rule 23(b)(3) Is Appropriate Because Common Issues Predominate and Because a Class Action Is the Superior Method for Resolving the Disputes.

Plaintiffs' fraud, breach of UCL claims[9] (and alternatively Plaintiffs' employment claims) should be certified under Rule 23(b)(3).  Rule 23(b)(3) requires a finding that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); *see also Molski v. Gleich*, 318 F.3d 937, 947 n.10 (9th Cir. 2003).  Both requirements are satisfied.

a)     Common Questions Predominate.

The Ninth Circuit has repeatedly held that "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) (quoting *Hanlon*, 150 F.3d at 1022).  Plaintiffs need not establish that there are no individual issues, only that the class issues predominate.  *Id.* at 1163.  Predominance is satisfied when the "proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Here, common factual and legal questions predominate over any other questions.  As discussed in detail above, Plaintiffs' claims present numerous common questions of law and fact that are predicated upon JK's uniform conduct in the sale, operation and compensation of franchises.  Plaintiffs' employment-based claims all flow from the common question of whether franchisees are independent contractors or employees, which is primarily premised on the measure of control exerted upon them.  Indeed, as this Court has noted, "[w]here, as here, there is evidence that the duties of the job are defined by standardized procedures and policies, district courts have routinely

_____

[9] This includes Plaintiffs' First, Second, Third, Fourth, Fifth, Seventh and Fourteenth causes of action.  Plaintiffs are not seeking certification of their Sixth cause of action.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(B); CASE NO. CV 09-03495 SC

certified classes of employees challenging their classification as exempt, despite arguments about individualized differences in job performance."  *Cruz*, 2009 WL 1458032, at *10 (citing cases).

Common questions with respect to Plaintiffs' misrepresentation, breach of covenant of good faith and fair dealing, and UCL claims similarly predominate over individual questions.  As detailed above, these claims flow from JK's standard policies, practices and agreement, including JK's use of a standard franchise agreement that purports to make class members owners of their own businesses while subjecting them to oppressive and unfair terms.  JK is likely to claim that common questions do not predominate Plaintiffs' fraud-related claims because Plaintiffs must demonstrate actual reliance.  This is, however, incorrect.  As Judge Walker recently concluded in certifying claims under the UCL and common law fraud, "[P]laintiff's claims do not require individualized showing of reliance."  *Chavez*, 2010 WL 25825, at *10; *see In re Tobacco II Cases*, 46 Cal. 4th at 326-27; *Greenwood v. Compucredit Corp.*, 2010 WL 291842, at *7 (N.D. Cal. Jan 19, 2010).

Similarly, Plaintiffs' UCL unfairness claims present predominate common questions, *i.e.*, are specific terms of the standardized franchise contract and is JK's "system" of treatment of franchisees unfair under California law?  *See, e.g., Yokoyama,* 594 F.3d at 1093 (finding district court erred in concluding that individual issues predominated in consumer protection action).

Finally, it is well-established that individual damages issues, do not override a predominance finding.  *Yokoyama.*, 594 F.3d at 1094 (overturning a district court decision denying class certification on the basis of individual damage issues); *Blackie*, 524 F.2d at 905 ("[t]he amount of damages is invariably an individual question and does not defeat class action treatment").

In summary, the claims in this case raise numerous important common questions of law and fact.  Because of the number of these questions, and because the answer to so many of them will go directly to determining liability to the class, the predominance requirement is met.

b)   <u>A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of this Controversy</u>.

The class action device is the superior method for resolving Plaintiffs' claims.  "Where class-wide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d

24

1227, 1234 (9th Cir. 1996).  Courts consider the class's interest in individually controlling the claims and/or defenses, the extent that any other litigation exists concerning the controversy, the desirability of centralizing the litigation in one forum, and the potential difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).  Each present a showing that class treatment is superior in this case.

This case provides a single forum to protect the rights of over a thousand class members statewide.  The hundreds of individual actions that would be required absent a class action (even assuming individual workers had the wherewithal to bring such suits) would be inefficient, costly, and could lead to conflicting legal and factual findings.  *Yokoyama*, 594 F. 3d at 1093 (class action superior means of adjudicating deceptive practices cases); *Hanlon*, 150 F.3d at 1023 (superiority where strain on judicial resources if individual claims were separately tried).

In cases involving employment matters, like the ones at issue here, the alternative to a class case is often no case at all.  This is in large part due to employees' understandable fear of retaliation. "The risks entailed in suing one's employer are such that the few hardy souls who come forward should be permitted to speak for others when the vocal ones are otherwise fully qualified." *Ste. Marie v. Eastern Railroad Ass'n*, 72 F.R.D. 443, 449 (S.D.N.Y. 1976).  In addition, in cases involving UCL claims like those at issue here, the individual damages are often too small to merit individual actions.  *Discover Bank v. Super. Ct.*, 36 Cal. 4th 148, 163 (2005).  Moreover, Plaintiffs are not aware of individual franchisees pursuing these claims against JK in California.

This case is manageable because Jani-King has employed the same practices and policies with respect to all members of the class.  Under applicable precedents, this Court may utilize numerous different methods to determine the allocation of damages.  *See Newberg on Class Actions, supra,* § 9.59, pp. 447-48; *see In re Urethane Antitrust Litig.*, 237 F.R.D. 440 (D.Kan. 2006).  For instance, the Court may hear representative testimony to determine the amount of damages that may be awarded to class members.  *See Grochowski v. Phoenix Constr.*, 318 F.3d 80, 88 (2d Cir. 2003) ("[N]ot all employees need testify in order to prove FLSA violations or recoup back-wages").  For Plaintiffs' breach, UCL and fraud claims, the potential damages remedies include contract rescission and refunding of excessive fees, which is ascertainable through Jani-King's own records.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(B); CASE NO. CV 09-03495 SC

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court certify the class, appoint Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel.

DATED:  July 16, 2010                    Respectfully submitted,

                                         THE STURDEVANT LAW FIRM
                                         A Professional Corporation

                                         TALAMANTES/VILLEGAS/CARRERA, LLP

                                         LICHTEN & LISS-RIORDAN, P.C.


                                         By: /s/ Monique Olivier
                                             Monique Olivier
                                             Attorneys for Plaintiffs